UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MICHAEL MUTHEE MUNYWE,

Plaintiff,

v.

JULIE DIER, *et al.*,

Defendants.

CASE  NO.  3:21-CV-05218-BHS-JRC

REPORT AND RECOMMENDATION

Noting Date: **February 25, 2022**

Plaintiff filed a complaint under 42 U.S.C. § 1983. Dkt. 5. Before the Court are plaintiff's motion for summary judgment (Dkt. 23) and defendants' motion for summary judgment (Dkt. 34). As discussed below, defendants' motion for summary judgment should be GRANTED and plaintiff's motion for summary judgment should be DENIED.

Defendants arrested plaintiff on suspicion of sexual assault and unlawful imprisonment and transported him to a police station. Plaintiff offers testimony that defendants left him handcuffed in a holding cell for seven hours and denied him him water and use of the bathroom. Other than plaintiff's bare allegations, all the other evidence belies plaintiff's testimony. Furthermore, given the ongoing sexual assault investigation, even if this Court were to accept

1    plaintiff's testimony as true, these alleged conditions, do not appear to be punishment, and could

2    reasonably be considered a necessary means of preserving potential forensic evidence.

3    Additionally, plaintiff alleges that defendants made a discriminatory remark about his

4    nationality. There is no evidence linking this isolated remark to plaintiff's race or national origin.

5    And, assuming the statement was made as plaintiff alleges, there is evidence that the person who

6    perpetrated the crime was black and spoke with a heavy accent—which linked plaintiff as the

7    prime suspect. Plaintiff does not dipute these facts. Accordingly, no reasonable juror could

8    conclude that defendants violated plaintiff's federal rights.

9    **COMPLAINT'S ALLEGATIONS**

10    Plaintiff is a convicted and sentenced state prisoner who is incarcerated at the

11    Washington State Penitentiary. Dkt. 5 at 3. Plaintiff sues Julie Dier, William Muse, Jeffrey

12    Thiry, and Brian She. *Id.* at 2. At all relevant times, defendants Dier and Muse were detectives

13    for the Tacoma Police Department ("Department"), and defendants Thiry and She were patrol

14    officers for the Department. *Id.* at 4–5.

15    Plaintiff alleges that, at 5:30 p.m. on November 21, 2018, defendants Thiry and She

16    arrested him, handcuffed him "tightly" behind his back, and took him to the Department's

17    headquarters ("Police Station"). *See id.* at 6–7. There, "the officers [allegedly] locked [him] in a

18    holding cell whose concrete floor and bench were wet with some cleaning chemical[,] which

19    [caused] toxic fumes [that were] irritating and [choking]." *Id.* at 7. According to plaintiff, he

20    "complained to the officers that the handcuffs were very tight and were cutting [his] wrists,

21    asking that the handcuffs be loosened or removed but the officers said no." *Id.* Plaintiff further

22    alleges that defendant She "said that [plaintiff was] in big trouble and . . . [had] a crazy accent[]

23

24

1  and asked where [he] came from." *Id.* Plaintiff adds that he told defendant She that he came

2  "from Africa," whereupon defendant She allegedly said that that "makes it even worse." *Id.*

3       Plaintiff alleges that he lay "on [his] belly on the floor and at time struggled . . . on [the]

4  concrete[,] bench-like slab since [he] could not lay on [his] back due to the hurting cuffs." *Id.*

5  Plaintiff further alleges that he "again called on the officers and told them that the fumes from

6  the floor were affecting [him] when [he] breathe[d] but no help or attention was offered to

7  [him]." *Id.*

8       According to plaintiff, defendants Dier and Muse "were present" at some point. *Id.* At

9  that time, plaintiff "once again asked for some water to drink, to use [the] bathroom and [said]

10  that the cuffs were injuring [him] and [that] the floor['s] toxic fumes [were] hurting and affecting

11  [him]." *Id.* Plaintiff adds that, instead of attention[,] they all together continued chatting and

12  laughing and just ignored [his] pleas." *Id.*

13       Plaintiff alleges that, at 1:34 a.m. the following day, defendant Muse took him to "a

14  different room with [defendant Dier] for interrogation." *Id.* at 8. Plaintiff further alleges that he

15  told defendant Muse that his handcuffs were "tight and hurting [him]," whereupon defendant

16  Muse removed them. *Id.* Plaintiff adds that, "when [he] asked for some water to drink,"

17  defendants Muse and Dier gave him "a glass of water." *Id.*

18       Plaintiff alleges that, based on this "needless mistreatment," he "suffered cuts, bruises,

19  [and] swelling on his wrists after [a] long period of very tight handcuffs [with] his hands behind

20  his back." *Id.* at 9. Plaintiff further alleges that he sustained bruises, scars, and "swelling on his

21  knees after kneeling and struggling on the floor for many hours." *Id.* Additionally, plaintiff avers

22  that, because he was exposed to "toxic chemicals," he "continues to experience chest pains,

23  respiratory complications, [and] some chest inflammation[.]" *Id.* at 10.

24

1    Based on these allegations, plaintiff alleges that defendants violated the Eighth

2    Amendment, the Equal Protection Clause, and 42 U.S.C. § 1981. *Id.* at 11. Plaintiff seeks

3    damages and injunctive and declaratory relief. *Id.* at 24–25.

4                            **PROCEDURAL BACKGROUND**

5    Plaintiff filed his complaint. Dkt. 5. Defendants answered and the Court issued a

6    scheduling order. Dkts. 15–16. On October 8, 2021, plaintiff filed a motion for summary

7    judgment. Dkt. 23. Defendants filed a response. Dkt. 27. Plaintiff did not reply.

8    On November 1, 2021, defendants filed a motion for summary judgment. Dkt. 34.

9    Plaintiff filed a response. Dkt. 48. Defendants replied. Dkt. 50.

10                        **SUMMARY JUDGMENT STANDARD**

11    Summary judgment is only proper where the materials in the record show that there is no

12    genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

13    *See* Fed. R. Civ. P. 56(a), (c). "A 'material' fact is one that is relevant to an element of a claim or

14    defense and whose existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac.*

15    *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citation omitted). A disputed

16    material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict

17    for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where

18    the record taken as a whole could not lead a rational trier of fact to find for the non-moving

19    party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

20    U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

21    When reviewing a motion for summary judgment, the court must believe the nonmoving

22    party's evidence and draw all reasonable inferences in his or her favor. *T.W. Elec. Serv.*, 809

23

24

1    F.2d at 630–31. Also, the court must avoid weighing conflicting evidence or making credibility

2    determinations. *Id.* at 631.

3         "A summary judgment motion cannot be defeated by relying solely on conclusory

4    allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)

5    (citation omitted). "Likewise, mere . . . speculation do[es] not create a factual dispute for

6    purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir.

7    1996) (citation omitted). Moreover, "[a] mere scintilla of evidence supporting the non-moving

8    party's position is insufficient[ to survive summary judgment]." *Rivera v. Philip Morris, Inc.*,

9    395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted).

10                     **THE PARTIES' EVIDENCE**

11        **I.**     **Plaintiff's Evidence**

12         To support his motion for summary judgment, plaintiff submitted an affidavit. Dkt. 24.

13    Plaintiff did not clearly sign the affidavit under penalty of perjury. Rather, he states: "It is my

14    true belief that I am entitled to relief and [] summary judgment as a matter of law; . . . that what I

15    *deponed* herein is true and correct to the best of my knowledge and belief." *Id.* at 3 (emphasis

16    added).

17         It is debatable whether this language constitutes verification under 28 U.S.C. § 1746.

18    However, one meaning of "depone" is "to declare under oath, esp. in writing[.]"

19    https://www.collinsdictionary.com/us/dictionary/english/depone. Therefore, considering

20    plaintiff's *pro se* status, the undersigned liberally construes the subject language and finds that

21    plaintiff has adequately verified his affidavit. *Cf. Commodity Futures Trading Comm'n v.*

22    *Topworth Int'l, Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 1999) ("[Section] 1746 requires only that the

23

24

declaration 'substantially' comply with the statute's suggested language." (citation omitted)). As a result, the Court will consider the affidavit's statements as evidence.

But the Court will not consider the allegations in plaintiff's complaint as evidence. Plaintiff filed his complaint on this District's § 1983 form, which does not require verification. *See* Dkt. 5 at 23; *see also McKinnon v. Nikula*, No. 3:20-CV-5367-BHS-DWC, 2021 WL 6118742, at *1 (W.D. Wash. Nov. 17, 2021) (not considering allegations in § 1983 form as evidence on summary judgment), *report and recommendation adopted*, 2021 WL 6112647 (W.D. Wash. Dec. 27, 2021). Likewise, because plaintiff did not verify his response to defendants' motion for summary judgment, the Court will not consider its allegations as evidence. *Cf. Johnson v. Meltzer*, 134 F.3d 1393, 1400 (9th Cir. 1998) ("Like a verified complaint, a verified motion functions as an affidavit." (citation omitted)).

In his affidavit, which is being considered as evidence, plaintiff alleges:

- On November 21, 2018, between 5:00 and 5:30 p.m., defendants Thiry and She arrested him and tightly handcuffed him behind his back.

- Defendants Thiry and She asked plaintiff where he was from due to his thick accent and, when plaintiff told them, they replied that that made it worse and that plaintiff was in big trouble.

- All defendants refused to uncuff him in the holding cell and watched him through the glass for over eight hours "struggling" on the concrete. He alleges that the handcuffs were so tight that they cut, bruised, and injured his wrists. Also, plaintiff's knees suffered bruising and swelling due to the floor.

- The holding cell floor was wet with a toxic chemical whose fumes were choking and irritating.

1        •        Plaintiff was denied water to drink and use of the bathroom the entire time he was

2                 in the holding cell.

3        •        After almost nine hours, plaintiff was removed from the holding cell for

4                 interrogation.

5    Dkt. 24 at 1–2.

6        Plaintiff also attaches documents to his response, Dkt. 48 at 27–58, the material ones of

7    which the Court addresses in the legal analysis section below.

8        None of the supporting materials substantiate plaintiff's bare assertions above. In fact,

9    other than this affidavit, plaintiff has produced no evidence to support his allegations. And much

10   of the uncontradicted evidence contradicts plaintiff's assertions.

11   **II.    Defendants' Evidence**

12       On November 21, 2019, shortly before 5:30 p.m., defendants Thiry and She were

13   dispatched to an area in Tacoma regarding a distress call. Dkt. 36 at 168; Dkt. 40 ¶ 3; Dkt. 44 at

14   ¶ 3. The dispatcher advised them that a teenage female was being harassed by a male with a

15   heavy accent. Dkt. 36 at 168; Dkt. 44 ¶ 3.

16       When they arrived, defendants Thiry and She separated the female and the male, later

17   identified as plaintiff. Dkt. 44 ¶ 4. The female stated that plaintiff had pulled her into an alley

18   and put his penis in her mouth and was spitting on the sidewalk in disgust. Dkt. 36 at 206–07;

19   Dkt. 40 ¶¶ 5–6; Dkt. 44 ¶¶ 4, 7. Defendant Thiry observed plaintiff "to have a heavy accent."

20   Dkt. 44 ¶ 5. According to defendant Thiry, he asked plaintiff where he was from and plaintiff

21   replied Kenya. *Id.*

22       Defendant Thiry detained plaintiff by handcuffing him behind his back with his palms

23   together. Dkt. 44 ¶ 6. Defendant Thiry declares, and plaintiff does not dispute, that this method

24

1  conformed to his training and served to ensure defendant Thiry's safety. *Id.* Although plaintiff

2  disputes this, defendant Thiry further declares that officers are "careful not to make [the

3  handcuffs] too loose or too tight." *Id.*

4       After defendants She and Thiry questioned the female victim, defendant Thiry

5  transported plaintiff to the Police Station. *Id.* ¶¶ 8–10; Dkt. 40 at ¶¶ 6–7. Defendant She

6  "transported [the victim] to the Emergency Department at Mary Bridge Children's Hospital for

7  evaluation and treatment." Dkt. 38 ¶ 11; Dkt. 40 ¶ 7.

8       Defendant Thiry declares that he placed plaintiff in a holding cell at 6:31 p.m. Dkt. 44 ¶

9  13; Dkt. 39 at 11, 13. Plaintiff has not clearly disputed this assertion. Plaintiff merely states that

10 he was arrested between 5:00 p.m. and 5:30 p.m. and held in the holding cell for nearly nine

11 hours. Defendants' records show that defendants Thiry and She were dispatched to the scene

12 shortly before 5:30 p.m. Dkt. 36 at 168. And it is undisputed that, after investigating the incident,

13 defendant Thiry transported plaintiff to the police station, which would have taken some time.

14 Therefore, a reasonable juror could only conclude that plaintiff was placed in the holding cell at

15 6:31 p.m.

16       It is undisputed that, at this time, an investigation of the victim's allegations was ongoing.

17 Defendant Muse declares, and plaintiff does not dispute, that the "sexual assault examination led

18 to a delay in the forensic interview of the [victim]." Dkt. 38 ¶ 12. Defendant Muse further

19 declares, and plaintiff does not dispute, that defendant Muse "authored a Pierce County Superior

20 Court Search Warrant for [plaintiff's] person and clothing" at this time." *Id.* It is also undisputed

21 that the investigation and preparation of the search warrant continued until November 22, 2018

22 at 1:14 a.m., at which time defendant Muse "emailed a copy of [his] affidavit for the search

23 warrant to" the "on-call Pierce County Superior Court judge." *Id.* at 5, 17. Additionally, it is

24

1  undisputed that the judge authorized defendant Muse to sign the search warrant on her behalf at

2  1:18 a.m. *Id.* at 5, 15, 17.

3         Defendant Thiry declares that plaintiff was removed from the holding cell at 11:00 p.m.

4  and submits prison records to support this assertion. Dkt. 44 ¶ 13; Dkt. 39 at 11, 13. However,

5  the evidence supports a reasonable inference that plaintiff was taken directly from the holding

6  cell to the interview room. *See* Dkt. 36 at 15; Dkt. 38 ¶ 17 ("[Plaintiff] was cuffed at the time he

7  was taken from the temporary detention area to the interview room."). Furthermore, the video

8  recording of plaintiff's interview at the Police Station shows that the interview started at 1:33

9  a.m. Dkt. 37, Interview Video at 01:33:15 a.m.; *see also* Dkt. 36 at 44. Therefore, drawing all

10 reasonable inferences in plaintiff's favor, a reasonable juror could find that plaintiff did not leave

11 his holding cell until approximately 1:30 a.m. Thus, a reasonable juror could conclude that

12 plaintiff was in the holding cell for approximately seven hours (6:31 p.m. until approximately

13 1:30 p.m.).

14        The Police Station's temporary detention area has four rooms with windows so that

15 occupants can be monitored. Dkt. 39 ¶ 4; Dkt. 44 ¶ 11. Per the Department's "Detention—

16 Temporary Detention Rooms" policy ("Policy"), an officer who has secured a detainee in one of

17 the holding cells is responsible for the detainee's well-being. Dkt. 39 at 6–7. This responsibility

18 includes "[v]isual observation of the detainee . . . at least once every thirty . . . minutes." *Id.* at 7.

19        Defendant Thiry contends that, consistent with the Policy, he checked on plaintiff at least

20 every thirty minutes. Dkt. 44 ¶ 15. To support this statement, defendant Thiry notes that, on the

21 Detention Form, he "marked an 'X' every time [he] had visual or other contact with [plaintiff]

22 (sometimes more than once in 30 minutes)." Dkt. 44 ¶ 14; Dkt. 39 at 11. Plaintiff declares that

23

24

1  defendants watched him through the glass while he was in the holding cell, which is generally

2  consistent with defendant Thiry's statements.

3       Escorted by defendant Muse, plaintiff entered the interview room at 1:30 a.m. Dkt. 37,

4  Interview Video at 01:30:35 a.m. Defendant Muse removed plaintiff's handcuffs as soon as they

5  entered the interview room. *Id.* at 01:30:52. At that time, plaintiff said that his wrists were

6  uncomfortable. *Id.* at 1:30:56; Dkt. 38 ¶ 19. Defendant Muse quickly touches plaintiff's right

7  wrist and does not say anything else about the matter. Shortly thereafter, plaintiff quickly

8  stretches his wrists then touches his left wrist. Dkt. 37, Interview Video at 1:31:07–1:31:10. For

9  the rest of the interview, plaintiff does not take any actions indicating wrist discomfort or voice

10 any further complaints about his wrists. Although the video does not afford the clearest view of

11 plaintiff's wrists, the record contains no objective medical evidence to support plaintiff's

12 assertion that the tight handcuffing caused him wrist injuries. Likewise, plaintiff displayed no

13 obvious signs of respiratory distress during the interview.

14      Defendant Dier gave plaintiff a cup of water at the start of the interview. *Id.* at 1:32:57. It

15 is unclear whether plaintiff asked or if defendants offered it. During a pause in the interview,

16 plaintiff gestured that he would like some more water. *Id.* at 02:39:35. Defendant Dier brought

17 him more water when she returned to the room. *Id.* at 02:47:35. Plaintiff did not ask for water

18 again on the video. Nor did he complain about having been denied water while he was in the

19 holding cell.

20      At the start of the interview, defendant Muse told plaintiff that he could take a bathroom

21 break during the interview and that he could "arrange for that a little bit later." *Id.* at 1:34:09–

22 1:34:15. Plaintiff did not ask to use the bathroom on the video. Nor did he complain about

23 having been denied use of the bathroom while in the holding cell.

24

1    After defendants Muse and Dier interviewed plaintiff, defendant Muse read the search

2    warrant to him. *Id.* at 2:50:59–2:53:47. Plaintiff's "penis was swabbed with sterile cotton swabs

3    as described on the warrant; the purpose was to collect any trace DNA belonging to the

4    [victim]." Dkt. 38 at 8, 12. Also, plaintiff's "pants and underpants were taken as evidence, as

5    described on the warrant." *Id.* Defendant Muse declares, and plaintiff does not dispute, that this

6    "was especially important if [the victim's] DNA was found (<u>as it ultimately was</u>) under the three

7    layers of clothing that [plaintiff] was wearing, since [plaintiff] maintained that he had never

8    exposed his genitals to [the victim] or had any contact with her under his clothing." *Id.* ¶ 26.

9    After defendants interviewed plaintiff and swabbed him, defendant Muse handcuffed

10   plaintiff in preparation for his transport to the Pierce County Jail ("Jail"). Plaintiff stated that the

11   handcuffs were "so tight," whereupon defendant Muse loosened them. Dkt. 37, Interview Video

12   at 03:08:39. A few minutes later, plaintiff asked defendant Muse to "unhook" the handcuffs at

13   the Jail, to which defendant Muse responded that the handcuffs would be removed at the Jail. *Id.*

14   at 03:12:36–52. Thereafter, plaintiff was transported to the Jail on charges of second-degree rape

15   and unlawful imprisonment. Dkt. 38 ¶ 27.

16                                    **LEGAL ANALYSIS**

17   **I.    Eighth Amendment**

18   When the alleged events underlying the complaint took place, plaintiff had been arrested,

19   but not convicted of a crime. Dkt. 28 at 21. "Eighth Amendment protections apply only once a

20   prisoner has been convicted of a crime." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5

21   (9th Cir. 2016) (citation omitted). So defendants are entitled to judgment as a matter of law on

22   plaintiff's Eighth Amendment claim.

23

24

1    II.    **Fourteenth Amendment**

2        The parties both contend that plaintiff was a pretrial detainee when the alleged events

3    underlying the complaint took place and analyze plaintiff's Eighth Amendment claim as a

4    Fourteenth Amendment claim. *See, e.g.*, Dkt. 34 at 11; Dkt. 48 at 9–10. Consistent with the

5    parties' briefs, the Court analyzes plaintiff's allegations of unlawful conditions of confinement

6    under the Fourteenth Amendment. *See Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067–68

7    (9th Cir. 2016) ("Inmates who sue prison officials for injuries suffered while in custody may do

8    so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted,

9    under the Fourteenth Amendment's Due Process Clause." (citation omitted)).

10       For a plaintiff to prove that a defendant has exposed him to conditions of confinement

11   that violate due process, he must show that: "(i) the defendant made an intentional decision with

12   respect to the conditions under which the plaintiff was confined; (ii) those conditions put the

13   plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable

14   available measures to abate that risk, even though a reasonable official in the circumstances

15   would have appreciated the high degree of risk involved—making the consequences of the

16   defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the

17   plaintiff's injuries." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (citation

18   omitted); *see also Stewart v. Maricopa Cty. Jail*, No. 21-15061, 2021 WL 4893342, at *1 (9th

19   Cir. Oct. 20, 2021) (indicating that test stated in *Gordon* applies to a pretrial detainee's claim of

20   unconstitutional conditions of confinement (citation omitted)).

21       "With respect to the third element, the defendant's conduct must be objectively

22   unreasonable, a test that will necessarily turn on the facts and circumstances of each particular

23   case." *Gordon*, 888 F.3d at 1125 (alteration adopted) (citations and internal quotation marks

24

omitted). "The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id.* (citation and internal quotation marks omitted). "Thus, the plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (citation and internal quotation marks omitted).

Here, plaintiff's bare allegations constitute a scintilla of evidence.

However, there is no objective medical evidence to support plaintiff's contentions of respiratory distress and injuries to his wrists and knees. True, regarding the alleged toxic chemical, plaintiff notes that he submitted a kite in May 2020 stating that he had a lump on his breast and had been experiencing sharp pain "for weeks." Dkt. 48 at 17, 27. However, plaintiff declares that defendants exposed him to the toxic chemical in November 2018. The alleged fact that plaintiff had been experiencing sharp pain "for weeks" before May 2020 does not reasonably suggest a causal relationship between the alleged exposure and plaintiff's subsequent development of breast lumps. Moreover, plaintiff's ultrasound report states that the lumps were benign and did not attribute them to the exposure of any toxic chemical. *Id.*

The video of plaintiff's interview also fails to support plaintiff's contention of respiratory distress and physical injury based on confinement in the holding cell. Plaintiff does not display any signs of respiratory distress on the video. Furthermore, despite his allegations of bruising and swelling to his knees, plaintiff walked into the interview room in no apparent distress. Likewise, when examined with his pants down, although it was not the focus of the examination, there is nothing on the video to indicate any problem with his knees. At no point in the video does plaintiff complain about having "struggled" on the holding cell's floor or any resulting injury to his knees.

1    Granted, plaintiff says that his wrists were uncomfortable when he entered the room

2    handcuffed. As noted, however, there is no objective evidence in the record that he sustained

3    cuts, bruises, or any other injury from the allegedly tight handcuffing. Indeed, plaintiff concedes

4    that his wrists were "not bleeding," *see* Dkt. 48 at 18, which undermines his assertion that the

5    handcuffs cut him.

6    Furthermore, the video does not support plaintiff's contention that defendants put him at

7    substantial risk of serious harm by denying him bathroom use and water in the holding cell.

8    Although defendant Muse tells plaintiff he can use the bathroom at the start of the interview,

9    plaintiff does not ask to use the bathroom on the video, which lasts over 1.5 hours. True,

10    defendant Dier gave plaintiff a cup of water at the start of the interview, and it is possible that

11    plaintiff asked for it. But plaintiff does not display any obvious signs of excessive thirst at the

12    start of the interview. Additionally, although plaintiff gestures to defendant Dier that he wanted

13    more water later in the interview, one would reasonably expect a suspect to ask for more water

14    after detectives have interviewed him for over an hour. Moreover, at no point in the video does

15    plaintiff complain that any defendant denied his requests for water or bathroom use. In short, the

16    video does not support plaintiff's contention that defendants' denial of water and bathroom use

17    while he was in the holding cell harmed him or caused him significant discomfort.

18    The record also reflects that defendants had an objectively reasonable basis to keep

19    plaintiff handcuffed in the cell and to deny him water and bathroom use. It is undisputed that,

20    while plaintiff was in the holding cell, a sexual assault investigation was ongoing and defendants

21    were preparing a search warrant. If plaintiff's hands had been free, he might have been able to

22    touch his genitals, potentially interfering with the detectives' lawful task of collecting evidence

23    from him. Likewise, if plaintiff had gone to the bathroom, he might have been able to destroy

24

1    potential evidence by washing himself. *See* Dkt. 44 ¶ 15. Similarly, the officers reasonably could

2    have believed that the detectives would need to swab plaintiff's mouth for DNA and that water

3    consumption could potentially frustrate that task. *See id.* ¶ 14. True, there is no evidence that

4    these concerns were defendants' *subjective* motivation for allegedly leaving plaintiff handcuffed

5    and denying him water and bathroom use. However, to prove that defendants recklessly

6    disregarded his conditions of confinement, plaintiff must show that defendants' conduct was

7    *objectively* unreasonable. *Gordon*, 888 F.3d at 1125. Here, plaintiff was the prime suspect in a

8    sexual assault investigation. Furthermore, the undisputed evidence shows that the detectives

9    diligently sought to obtain a search warrant while plaintiff was in the holding cell and

10    interviewed him shortly after they obtained the warrant. On these facts, a reasonable juror could

11    only conclude that keeping plaintiff in the holding cell for seven hours in the conditions

12    described above was objectively reasonable.

13           In sum, plaintiff has only provided a scintilla of evidence to support his claim that

14    defendants exposed him to unlawful conditions of confinement—his affidavit. However, the

15    affidavit's bare allegations of injuries lack objective evidentiary support and are largely

16    contradicted by the interview video. Furthermore, the undisputed evidence shows that defendants

17    had an objectively reasonable basis to keep plaintiff handcuffed in the holding cell and deny him

18    water and bathroom use. Accordingly, no reasonable juror could conclude that defendants

19    recklessly disregarded a substantial risk of serious harm to plaintiff in violation of the Fourteenth

20    Amendment.

21           Plaintiff further argues, in essence, that his conditions of confinement violated due

22    process because they were punitive. *See* Dkt. 48 at 11–12; *see also* Dkt. 34 at 16–18 (defendants

23    addressing this argument); *see generally Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the

24

1   Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in

2   accordance with due process of law." (citations omitted)).

3       "[T]he Government [] may detain [a pretrial detainee] to ensure his presence at trial and

4   may subject him to the restrictions and conditions of the detention facility so long as those

5   conditions and restrictions do not amount to punishment. . . ." *Bell*, 441 U.S. at 536–37.

6   However, "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in

7   the constitutional sense." *Id.* at 537. "A court must decide whether the disability is imposed for

8   the purpose of punishment or whether it is but an incident of some other legitimate governmental

9   purpose." *Id.* at 538 (citation omitted).

10      "'[P]unishment' can consist of actions taken with an 'expressed intent to punish.'"

11  *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (quoting *Bell*, 441 U.S. at 538). Furthermore,

12  "in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by

13  showing that the actions are not 'rationally related to a legitimate nonpunitive governmental

14  purpose' or that the actions 'appear excessive in relation to that purpose.'" *Id.* (quoting *Bell*, 441

15  U.S. at 561). In determining whether actions are rationally related to a legitimate nonpunitive

16  purpose or appear excessive in relation to that purpose, courts must consider "objective

17  evidence." *Id.*

18      Here, no reasonable juror could conclude that plaintiff's conditions of confinement

19  amounted to punishment. Even if the Court were to accept plaintiff's bare assertions that he was

20  handcuffed behind his back in a holding cell for seven hours and denied water and bathroom use,

21  these facts do not, absent more, support a reasonable finding that defendants *expressly* intended

22  to punish plaintiff by exposing him to these conditions. True, plaintiff states that defendants

23  Thiry and She asked where he was from and, after he responded, told him that that made it worse

24

1    and that he was in big trouble. However, there is no evidence that these alleged statements were

2    driven by discriminatory intent. The dispatcher told defendants Thiry and She that the perpetrator

3    of the alleged offense had a thick accent. So defendant Thiry had a legitimate reason

4    (identification) to ask plaintiff where he was from when he arrived on the scene. Dkt. 44 ¶ 5.

5    Likewise, defendant Muse reasonably asked plaintiff about his background to ensure that

6    plaintiff spoke English sufficiently well to participate in the interview. Dkt. 38 ¶¶ 21–22.

7            Nor could a reasonable juror conclude that leaving plaintiff handcuffed in a holding cell

8    for seven hours without water or bathroom use lacked a rational relationship to a legitimate

9    governmental purpose or was excessive in relation to that purpose. As discussed, the officers had

10   an objectively reasonable basis to keep plaintiff in such conditions while the sexual assault

11   investigation was ongoing and the detectives sought to obtain a search warrant. When analyzing

12   whether governmental action is rationally related to a legitimate governmental purpose or

13   excessive in relation thereto, "subjective considerations" are irrelevant. *See Kingsley*, 576 U.S. at

14   399. Accordingly, a reasonable juror could only conclude that plaintiff's conditions of

15   confinement did not constitute punishment under the Due Process Clause.

16           Plaintiff also contends that his conditions of confinement were "conscience shocking" in

17   violation of due process. Dkt. 48 at 13. "The substantive due process standard requires showing

18   that an officer engaged in an abuse of power that shocks the conscience and violates the

19   decencies of civilized conduct." *Tobias v. Arteaga*, 996 F.3d 571, 584 (9th Cir. 2021) (alteration

20   adopted) (citation and internal quotation marks omitted).

21           Here, no reasonable juror could conclude that defendants' conduct constituted an abuse

22   of power that shocked the conscience or violated the decencies of civilized conduct.

23

24

1    Therefore, summary judgment should be granted to defendants on plaintiff's Fourteenth

2    Amendment claim.

3         **III.    Fourth Amendment**

4         Defendants also treat plaintiff's contention that his handcuffs were too tight as a

5    standalone claim and analyze it under Fourth Amendment standards. *See* Dkt. 34 at 15–16.

6    "Excessive force against an arrestee while detained in custody post-arrest but pre-arraignment is

7    analyzed under the Fourth Amendment reasonableness standard." *Kramer v. Gutierrez*, No. 19-

8    CV-04168-HSG, 2019 WL 3575077, at *2 (N.D. Cal. Aug. 6, 2019) (citing *Pierce v. Multnomah*

9    *Cty., Or.*, 76 F.3d 1032, 1043 (9th Cir. 1996)). So, the Fourth Amendment applies to plaintiff's

10   claim that defendants used overly tight handcuffs.

11        "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in

12   the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed

13   under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham v. Connor*, 490 U.S.

14   386, 395 (1989) (emphasis in original). Whether an officer's use of force is "reasonable"

15   "requires careful attention to the facts and circumstances of each particular case." *Id.* at 396

16   (citation omitted). Conclusory allegations unsupported by medical records or other documentary

17   evidence are insufficient to survive summary judgment on a plaintiff's claim that defendants

18   used excessive force by applying tight handcuffs, thus injuring him. *See Arpin v. Santa Clara*

19   *Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001). *But see Palmer v. Sanderson*, 9 F.3d

20   1433, 1436 (9th Cir. 1993) (denying summary judgment where the plaintiff contended that the

21   defendant "fastened [] handcuffs so tightly around his wrist that they caused [him] pain and left

22   bruises that lasted for several weeks" and refused "to loosen the handcuffs after [the plaintiff]

23   complained of the pain").

24

1    Here, plaintiff's contention that defendants used overly tight handcuffs is not supported

2  by substantial evidence, and, in fact, is contradicted by the objective evidence. First, there is no

3  objective medical evidence to support his conclusory allegations. And while *Palmer* suggests

4  that medical records are not always necessary to survive summary judgment on a claim of tight

5  handcuffing, in this case, plaintiff's declaration that the tight handcuffing "cut, bruise[d ,] and

6  injure[d] his wrists," Dkt. 24 at 2, is contradicted by his lack of apparent distress and failure to

7  seriously complain about his wrists during the interview. *See supra* p. 10. Furthermore, in his

8  affidavit, plaintiff does not specify how long his wrists stayed bruised or clearly state that he

9  asked defendants to loosen the handcuffs while in the holding cell. *See* Dkt. 24 at 1–2.

10  Additionally, pre- and post-*Palmer* cases denied summary judgment on tight handcuffing claims

11  where, unlike here, the plaintiff sought medical attention for related injuries. *See Wall v. Cty. of*

12  *Orange*, 364 F.3d 1107, 1110, 1112 (9th Cir. 2004); *LaLonde v. Cty. of Riverside*, 204 F.3d 947,

13  953, 960 (9th Cir. 2000); *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989). So *Palmer* is

14  inapposite.

15    In sum, no reasonable juror could conclude that defendants used overly tight handcuffs

16  on plaintiff in violation of the Fourth Amendment.

17    **IV.    Equal Protection Clause**

18    "The Equal Protection Clause of the Fourteenth Amendment commands that no State

19  shall deny to any person within its jurisdiction the equal protection of the laws, which is

20  essentially a direction that all persons similarly situated should be treated alike." *City of*

21  *Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation and internal quotation

22  marks omitted). "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection

23  Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an

24

1  intent or purpose to discriminate against the plaintiff based upon membership in a protected

2  class." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (citation omitted).

3      Furthermore, "[w]here . . . state action does not implicate a fundamental right or a suspect

4  classification, the plaintiff can establish a 'class of one' equal protection claim by demonstrating

5  that it 'has been intentionally treated differently from others similarly situated and that there is

6  no rational basis for the difference in treatment.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d

7  936, 944 (9th Cir. 2004) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

8      Here, a reasonable juror could not conclude that defendants intentionally discriminated

9  against plaintiff based on his race and/or nationality. Plaintiff alleges that defendants Thiry and

10  She asked where he was from and, after he told them, said that that made it worse and that he

11  was in big trouble. Without more, this conclusory allegation does not support a reasonable

12  finding that defendants intentionally discriminated against plaintiff based on his race and/or

13  nationality. As discussed, defendant Thiry had a legitimate law enforcement purpose to ask

14  plaintiff where he was from. The alleged fact that he and defendant She told plaintiff this made it

15  worse and that he was in big trouble does not, absent more, support a reasonable finding that

16  they made that remark to deny him equal protection under the law. No evidence links this

17  isolated, allegedly "discriminatory remark[]" to plaintiff's conditions of confinement. *Cf.*

18  *Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998) ("To establish a claim of

19  discrimination, there must be a sufficient nexus between the alleged discriminatory remarks and

20  the adverse employment decision." (citation omitted)).

21      Plaintiff also contends that defendants violated equal protection because "the other

22  persons in the other cells were not being tightly cuffed [behind] their backs." Dkt. 48 at 18–19.

23  This allegation is conclusory as well. Plaintiff does not identify the race and/or nationality of

24

REPORT AND RECOMMENDATION - 20

1  these persons or explain how they were similarly situated to him. Furthermore, plaintiff so

2  contends in this response, whose unverified contentions do not count as evidence on summary

3  judgment.

4       In sum, no reasonable juror could conclude that defendants violated the Equal Protection

5  Clause.

6  **V.    42 U.S.C. § 1981**

7       Section "1981 . . . was meant, by its broad terms, to proscribe discrimination in the

8  making or enforcement of contracts against, or in favor of, any race." *Gratz v. Bollinger*, 539

9  U.S. 244, 276 n.23 (2003) (citation and internal quotation marks omitted). Section 1981 is

10  "intended to protect from discrimination identifiable classes of persons who are subjected to

11  intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint*

12  *Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *see also Mustafa*, 157 F.3d at 1180 (to

13  prevail on § 1981 claim, plaintiff "must prove that the defendants acted with intent to

14  discriminate" (citation omitted)).

15       Here, plaintiff's § 1981 claim fails as a matter of law. Plaintiff has not "identif[ed] an

16  impaired contractual relationship . . . under which [he] has rights." *Domino's Pizza, Inc. v.*

17  *McDonald*, 546 U.S. 470, 476 (2006) (citation and internal quotation marks omitted).

18  Furthermore, as discussed above, plaintiff's evidence does not support a reasonable finding that

19  defendants intentionally discriminated against him. In short, plaintiff's § 1981 claim presents no

20  genuine issues for trial.

21  **VI.    Plaintiff's Motion for Summary Judgment**

22       The above analysis is dispositive of plaintiff's motion for summary judgment. As

23  discussed, no reasonable juror could rule in plaintiff's favor on any of his claims. It follows that

24

1  a reasonable juror could conclude that defendants did not violate plaintiff's constitutional rights

2  as he alleges.

3        The Court notes plaintiff's contention in his motion for summary judgment that

4  defendants failed to respond to certain discovery requests. Dkt. 23 at 1. However, plaintiff

5  submits responses to some of these discovery requests with his response to defendants' motion

6  for summary judgment. Dkt. 48 at 47–53. It appears that defendants provided plaintiff the

7  discovery he sought after he filed his motion for summary judgment. So plaintiff's discovery

8  objection is moot.

9        In short, plaintiff's motion for summary judgment should be denied.

10                    *IN FORMA PAUPERIS* ("IFP") STATUS ON APPEAL

11        Plaintiff should be granted IFP status for purposes of an appeal of this matter. IFP status

12  on appeal shall not be granted if the district court certifies "before or after the notice of appeal is

13  filed" "that the appeal is not taken in good faith[.]" *See* Fed. R. App. P. 24(a)(3)(A). "The good

14  faith requirement is satisfied if the petitioner seeks review of any issue that is not frivolous."

15  *Gardner v. Pogue*, 558 F.2d 548, 551 (9th Cir. 1977) (citation and internal quotation marks

16  omitted). Generally, an issue is not frivolous if it has an "arguable basis either in law or in facts."

17  *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Because an appeal from this matter would not

18  be frivolous, IFP status should be granted for purposes of appeal.

19                              **CONCLUSION**

20        As discussed above, it is recommended that defendants' motion for summary judgment

21  (Dkt. 34) be **GRANTED** and that plaintiff's motion for summary judgment (Dkt. 23) be

22  **DENIED**.

23

24

1       Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

2 fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

3 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

4 review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

5 of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985);

6 *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating

7 the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on

8 **February 25, 2022** as noted in the caption.

9       Dated this 7th day of February, 2022.

10

11                                 J. Richard Creatura

12                                 Chief United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24